**Donald R. MITCHELL,
Plaintiff–Appellant,**

v.

**DATA GENERAL CORPORATION,
Defendant–Appellee.**

No. 93–1238.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 1, 1993.

Decided Dec. 22, 1993.

---

R. Bradley Miller, Raleigh, NC, argued for plaintiff-appellant.

Laura Broughton Russell, argued (Cecil W. Harrison, Jr., on brief), Poyner & Spruill, Raleigh, NC, for defendant-appellee.

Before NIEMEYER and HAMILTON, Circuit Judges, and BUTZNER, Senior Circuit Judge.

## OPINION

NIEMEYER, Circuit Judge:

Donald R. Mitchell, one of four corporate managers of quality assurance for Data General Corporation, was discharged by Data General in November 1990 as part of a reduction-in-force. At the time Mitchell was 58 years old. Contending that age was a determining factor for his discharge, Mitchell sued Data General under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* The district court granted Data General's motion for summary judgment, concluding that the evidence presented was inadequate to establish that age was a determining factor in terminating Mitchell's employment. The court relied principally on the fact that the same officer of Data General who selected Mitchell for inclusion in the reduction-in-force had also hired Mitchell four months earlier.

Having reviewed the entire record presented to the district court, we agree that Mitchell failed to prove a claim for age discrimination under the ADEA. We therefore affirm.

I

Beginning in 1985, Data General, a manufacturer of computers, undertook a series of reductions-in-force due to economic pressure from increased competition in the computer industry. At that time it employed 17,700 persons. By November 1990, it had reduced its total number of employees to 9,700, and by September 1992, to 7,200.

Data General also began in the 1980's to restructure its organization to increase efficiency, moving quality control assurance from a plant level activity to a corporate-wide activity. Contemporaneously, it shifted the emphasis of quality control from a "policing" effort that had been conducted *after* production to an effort at improving how products were being manufactured, with the hope of "manufacturing out" quality control problems.

In early 1990, when Data General established the corporate quality assurance department, it appointed Rod Gilvey as director of the department. Gilvey organized the department, creating four upper level management positions that reported to him: customer assurance, product assurance, process quality, and quality assurance policy/administration. In the spring of 1990, Gilvey invited Mitchell to apply for the customer assurance manager position. At the time, Mitchell was quality control manager of the plant in Apex, North Carolina. He had moved to Apex in 1988 from the Data General plant at Clayton, North Carolina, where he began his career with Data General in 1979 as a quality engineering section manager. Although Mitchell was initially noncommittal, he was concerned that corporate restructuring would eliminate his current plant position, and he eventually submitted an application for the position of corporate manager of customer assurance.

Gilvey considered ten applicants for the position of customer assurance manager, including Mitchell. During the course of his interview with Mitchell, Gilvey told Mitchell that he was looking for someone who would energize the new quality assurance effort—a "zealot," "someone who has a vision, can effectively communicate that vision and stimulate others in order to achieve real results." According to Gilvey, self-motivation in the

new position was required because of the change in focus of Data General's quality control program. After interviewing other applicants for the position, Gilvey selected Mitchell, who, at age 58, was the oldest of the group. The other candidates ranged in age from 33 to 44. Gilvey stated that although he was concerned about Mitchell's lack of enthusiasm about the position, he selected Mitchell because of his experience. When the new department was staffed with its four new managers, Gilvey admonished the four that he had high expectations and planned to give each of them no more than six months in which to produce results.

In the ensuing months, according to Data General, Mitchell did not live up to expectations. Gilvey and Ralph Hudson, Gilvey's superior and a divisional vice president, testified that among some of Mitchell's most important duties, he was required to take initiative and travel regularly to the various Data General facilities under his responsibility to evaluate the performance of Data General's products in the field. His evaluations were important in assisting company engineers to redesign the products. Mitchell was also required to meet with customers. Mitchell's supervisors expected that Mitchell would have to be out of town for these purposes approximately every two weeks. In particular, they expected that Mitchell would have to visit Data General's sales and marketing organization in Westboro, Massachusetts, to visit the field engineering organization in Atlanta, and to handle customer complaints wherever they arose. During the first four months at his new position, Mitchell traveled out of town three times, twice to the facility at Westboro, Massachusetts, and once to Washington, D.C., to help resolve a customer complaint. He never did visit the company's Atlanta facility. Moreover, Mitchell allegedly showed little enthusiasm for the new position. According to Data General, he tolerated poor performance from his employees, interfered with the chain of command of other employees, and expressed a lack of support for the goals of the new corporate quality assurance department. As Gilvey summarized, Mitchell was just "turning the crank" to maintain the status quo.

Mitchell has disputed the charges leveled at him by Data General, pointing to his history of positive job evaluations in his prior position at the Apex plant and asserting that he traveled as frequently as was required.

With the November 1990 reduction-in-force, Gilvey added Mitchell and another employee from the quality assurance department to the list of those selected for discharge, even though Gilvey had not been requested to identify any individuals to be included on the reduction-in-force list. Gilvey explained that when he saw "some of the caliber of talent that was being proposed to exit the business from some of the other departments," he decided to set forward two candidates from the quality assurance department whose performance indicated that they should be among the first to go. The other employee included by Gilvey was under 40.

Mitchell was thus discharged in November 1990, and the three other managers in quality assurance department were retained. Two of them were under 40, and the other was 44. Of the 44 persons discharged during this reduction-in-force, 25 persons were under the age of 40, and 19 were over 40.

## II

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To establish a claim, a plaintiff must prove, with reasonable probability, that but for the age of the plaintiff, the adverse employment decision would not have been made. Age must have been a determining factor in the employment decision. *See Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 238 (4th Cir.1982). The burden of proof of an age discrimination claim may be satisfied, as with other types of discrimination claims, by direct evidence or by circumstantial evidence under a method of proof established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* scheme, once the plaintiff proves a prima facie case of discrimination,

the burden of producing a legitimate explanation shifts to the defendant. If the defendant articulates a legitimate nondiscriminatory explanation which, if believed by the trier of fact, would support the conclusion that discrimination was not a determining factor in the adverse employment decision, the presumption created by the prima facie case "drops from the case," and the plaintiff bears the ultimate burden to prove that the defendant intentionally discriminated against the plaintiff. *See St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Fink v. Western Electric Co.,* 708 F.2d 909 (4th Cir.1983) (adopting the *McDonnell Douglas* scheme for use in ADEA cases). In meeting the ultimate burden the plaintiff may offer proof that the defendant's explanation was a mere pretext.

■ To establish a prima facie case of age discrimination under the ADEA with circumstantial evidence, the plaintiff must prove a set of facts which would enable the fact-finder to conclude with reasonable probability that *in the absence of any further explanation,* the adverse employment action was the product of age discrimination. *See Duke v. Uniroyal, Inc.,* 928 F.2d 1413, 1418 (4th Cir.1991). In a typical discharge case, the plaintiff must show that (1) he was in the protected age group; (2) he was discharged; (3) at the time of the discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4) following the discharge, he was replaced by an individual of comparable qualifications outside the protected class. *See Lovelace,* 681 F.2d at 238–39.

■ In the context of a reduction-in-force, however, where a group of employees is discharged because of the company's economic conditions, the third and fourth elements outlined in *Lovelace* become meaningless. The employees at the time of a reduction-in-force are usually meeting the employer's performance expectations, and because there are reductions-in-force, the employees generally are not replaced. The question in this context is not why members of the group were discharged or whether they were meeting performance expectations, but whether the particular employees were selected for inclusion on the list for discharge because of their age. Therefore, to target age discrimination in a reduction-in-force context where the selection of employees for discharge is purportedly made on the basis of *relative performance,* even though all employees were meeting existing performance standards, a prima facie case may be established by showing that: (1) the employee was protected by the ADEA; (2) he was selected for discharge from a larger group of candidates; (3) he was performing at a level substantially equivalent to the lowest level of those of the group retained; and (4) the process of selection produced a residual work force of persons in the group containing some unprotected persons who were performing at a level lower than that at which he was performing. *See Duke,* 928 F.2d at 1418.

■ When a plaintiff's case is presented under the *McDonnell Douglas* proof scheme in response to a defendant's motion for summary judgment, the plaintiff must present admissible evidence to establish a prima facie case. If the defendant then advances a legitimate explanation, the plaintiff must present evidence, including that in support of his prima facie case, that satisfies the ultimate burden of persuasion. Although the proof scheme is staged with shifting burdens, such discrimination cases may nevertheless be evaluated under established summary judgment principles.

■ Federal Rule of Civil Procedure 56, directing that summary judgment be entered when a moving party shows "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law," provides a procedure with which to bypass a trial when the fact resolution process of trial would prove to be of no use in the disposition of the case. The rule structures an analysis of proffered proof that provides a forecast of the need for a trial. Thus, when the parties submit admissible evidence on the issue in question under a summary judgment motion, the court can determine that a trial is unnecessary only if either the facts are undisputed, or if disputed, the dispute is of no consequence to the

dispositive question. The Supreme Court has long held that judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting *Improvement Co. v. Munson,* 14 Wall. 442, 448, 20 L.Ed. 867 (1872)). The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial. The standard is virtually the same as that applied at trial when considering a motion for judgment under Federal Rule of Civil Procedure 50. *See Anderson,* 477 U.S. at 247–52, 106 S.Ct. at 2509–12 (holding that a motion for summary judgment should be granted when the proof, taken in the form admissible at trial and resolving all factual doubts in favor of the non-moving party, would lead a reasonable juror to but one conclusion). In short, the summary judgment procedure allows the court to forecast the proof at trial to determine whether consequential facts are in dispute, and if not, to resolve the case without a trial.

■ While the proof scheme in a discrimination case can make the summary judgment analysis somewhat trickier, a defendant can still obtain a summary judgment in one of two ways. He can demonstrate that the plaintiff's proffered evidence fails to establish a prima facie case, or, if it does, the defendant can present evidence that provides a legitimate nondiscriminatory explanation about which the plaintiff does not create a factual dispute. Since Data General claims to be entitled to summary judgment on both bases, we turn to the questions of (1) whether Mitchell has presented evidence sufficient to establish a prima facie case, and (2) whether he has shown that there is a genuine dispute of material fact about Data General's proffered explanation for the discharge.

## III

■ Considering first the elements of a prima facie case in the context of a reduction-in-force, it becomes apparent that Mitchell has not met the burden of showing (1) that he was performing substantially at the level equivalent to those retained within his group, or (2) that persons retained who are under 40 years old were performing at a level lower than his. The undisputed record shows that when Mitchell was appointed to the new quality assurance position, which had broader responsibilities than his previous position, he was advised that the new position would require energy, initiative, and enthusiasm from him—he would need to be a "zealot." He was also told of the importance of out-of-town travel. As he himself testified, it was clear that he was expected to "hit the ground running," that the new position was "a start up" position, and that the company was "trying to get things changed fast." After several months, it became apparent that Mitchell was not living up to Data General's expectations. The common element in the failures described by Data General is that Mitchell did not approach the new position with the requisite level of initiative and enthusiasm. Gilvey stated that Mitchell "was turning the crank, ... basically maintaining the status quo. He was not driving the change to anywhere near the level that was expected in this corporate quality organization." Mitchell failed to visit the plants within his area of responsibility as expected, and he made little effort to make things "change fast."

Mitchell failed to present any evidence that he was performing at the level of the three other persons retained at his management level and to show that any one of those retained after the reduction performed at a level below Mitchell's at the time he was selected for inclusion on the reduction-in-force list. Although Mitchell has expressed disagreement with the company's characterization of his own performance, and has pointed to uniformly positive ratings given to him when he was the Apex plant manager of quality control, Mitchell nevertheless has failed to demonstrate that he performed in his new position at even the lowest level of those managers retained or that any one of

those retained were performing at a level below him. Thus, Mitchell has not established the third and fourth elements outlined in *Duke*. *See* 928 F.2d at 1418.

 Apparently Mitchell did not aim his proof at the requirements of *Duke* for reductions-in-force. Instead, he attempted to establish the traditional elements of *Lovelace* adopted for discharge cases. This tactic may be somewhat justified by the facts here. When the November 1990 reduction-in-force was planned, Mitchell was not a member of a group that was originally under consideration for reduction, and he, along with another employee in the quality assurance department, were only added later by Gilvey. Gilvey testified that he included the two employees from his department when he noticed that persons more qualified than those two were being selected for discharge within the reduction-in-force. In this respect, the factual circumstances might imply that Mitchell was not discharged purely as part of a reduction-in-force but rather because of a lack of individual performance combined with the opportunity for discharge presented by a reduction-in-force. Nevertheless, if we look at Mitchell's claim for age discrimination on the basis of an individual discharge and apply the standards established in *Lovelace* for a prima facie case, we must still conclude that Mitchell failed to meet his burden. The third element of *Lovelace* requires him to demonstrate that at the time of discharge, he was performing his job at a level that met his employer's legitimate expectations. 681 F.2d at 239. As we already have observed, Mitchell has been unable to show that Data General's expectations of him were not legitimate or that he satisfied the expectations.

We therefore conclude that the summary judgment entered by the district court is justified by Mitchell's failure to establish a prima facie case under any appropriate standard.

 The district court considered it unnecessary to conduct an analysis of whether the elements of a prima facie case had been established because it concluded from the entire record that Mitchell failed to meet his ultimate burden of proving age discrimination. Even if Mitchell's claim is measured against his ultimate burden and the analysis of all the evidence is conducted on the basis of the shifting burdens described by the Supreme Court in *Hicks*, we conclude that the district court was still correct in entering summary judgment.

Under the *McDonnell Douglas* scheme, as clarified in *Hicks*, once a prima facie case is established, the burden shifts to the employer to provide a legitimate nondiscriminatory explanation for the adverse employment action taken. If the employer meets this burden, then the *presumption* created by the prima facie case is rebutted and simply "drops out of the picture." *See Hicks,* ── U.S. at ──, 113 S.Ct. at 2749. The evidence, however, that was offered to establish the prima facie case remains in the case, together with any evidence presented to show that the employer's explanation was untrue or pretextual. All of the evidence must be considered in determining whether the plaintiff met his ultimate burden of proving that the employer intentionally discriminated against the employee by reason of age, and that age was a determinative factor in the adverse employment decision. *Id.* at ──, 113 S.Ct. at 2749. Thus, the plaintiff can fail to meet his burden, not only by failing to establish a prima facie case, but also by failing to show a genuine factual dispute over the employer's legitimate nondiscriminatory explanation.

Taking into account all of the evidence presented in the record, we are provided with a record not significantly different from that relevant to Mitchell's prima facie case. Mitchell argues that the criticisms leveled at him by Data General, that he "lacked enthusiasm" or was "just going through the motions," are likely to be pretextual as they are so easily stated about older workers. He seeks to reinforce this by pointing to the positive evaluations he received as a plant manager for quality control. He offered no evidence, however, to discredit the reasons for a reduction-in-force, the restructuring, or the heightened requirements for Mitchell's new position expressed by Gilvey when interviewing Mitchell in April 1990. Mitchell's argument that the described failures of performance were stereotypical of older workers

might carry some weight in another case. In this case, however, it was made quite clear to Mitchell at the outset, when Gilvey selected him despite his age of 58, that enthusiasm and initiative were primary qualifications for the job. It was also made clear to Mitchell that he was to "hit the road running" and to make things happen "fast." Mitchell agrees that these requirements were emphasized and the facts regarding these statements are uncontroverted. Under such circumstances, comments that Mitchell failed to meet them cannot fairly be characterized as stereotypical of older workers.

Taking the record as a whole, the situation remains that no direct evidence exists to indicate that age was a factor in selecting Mitchell for inclusion in the reduction-in-force and in discharging him. The only response offered by Mitchell to Data General's evidence is the conclusory characterization that the description of his nonperformance is consistent with stereotypical comments about older workers. Such conclusory allegations fail to create a factual dispute over Data General's explanation.

Our conclusion in this case is fortified by the inference in favor of Data General's position that is drawn from the fact that Gilvey, who selected Mitchell for inclusion on the list for reduction-in-force, was the same person who, only four months earlier, selected Mitchell from among ten applicants to fill the position Mitchell held. All other candidates at the time were significantly younger, and three were under 40. In *Proud v. Stone*, 945 F.2d 796 (4th Cir.1991), we recognized that when the individual who hires an employee is the same person who discharges him only a few months later, a strong inference arises that discrimination was not a determining factor for the adverse action, realizing that employer animus in termination, but not in hiring, would appear to be irrational.

Mitchell argues that *Proud v. Stone* should not be applied to this case because Gilvey did not hire him, but instead only offered him a lateral move from plant quality assurance manager to corporate quality assurance manager. According to Mitchell, if the court accepts the application of *Proud v. Stone* in these circumstances, there will be nothing left of the ADEA where an employer is in the midst of several reorganizations, since an employer would be insulated from suit after the first reorganization. Mitchell's fears, however, are unsupported. As we said in *Proud v. Stone*, there is nothing preventing a court from looking past the form of reorganization to determine if the moves were in fact a "shell game" to avoid liability. In this case, we are unable to find any such indications. Both parties accept the legitimacy of the corporate reorganization that created four new corporate manager positions. For the position given to Mitchell, Gilvey interviewed ten people, nine of whom were significantly younger than Mitchell. If Gilvey had wanted to discriminate on the basis of age, it would have been much easier for him to do so in June 1990 when he hired Mitchell, rather than in November 1990, when he fired Mitchell.

Because Mitchell failed to establish a prima facie case and failed to carry the ultimate burden of persuasion in the face of the employer's nondiscriminatory explanation by establishing a genuine issue of material fact in connection with the explanation, we affirm the summary judgment entered by the district court in favor of Data General.

*AFFIRMED.*